UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JUAN ROBERTO BARRON-SALAZAR,

      Petitioner,

v.                                Case No. 8:22-cv-1121-WFJ-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Juan Roberto Barron-Salazar, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 13). Mr. Barron-Salazar filed a reply. (Doc. 19). After careful review, the petition is **DENIED**.

## I.    Background

This case arises from Mr. Barron-Salazar's sexual abuse of C.S., his biological daughter. C.S. lived in Manatee County, Florida with Mr. Barron-Salazar, her three siblings, and her mother. (Doc. 14-2, Ex. 1a, at 200-01). The abuse began when C.S. was seven years old and continued until she was twelve. (*Id.* at 202-03, 208-09). On several occasions, Mr. Barron-Salazar touched her breasts, buttocks, and vagina, digitally penetrated her vagina, performed oral sex on her, and forced her to perform oral sex on him. (*Id.* at 205-09). On one occasion, he attempted to insert his penis into her vagina, but he "stopped" when she "told him that it hurt." (*Id.* at 215).

Mr. Barron-Salazar told C.S. to "pinky promise that [she] wouldn't tell anybody" about the abuse. (*Id.* at 206). She kept it secret for several years because she "was scared that he would . . . yell at [her] or hit [her]." (*Id.* at 352). C.S. eventually disclosed the abuse after learning that Mr. Barron-Salazar was also molesting her younger sister, S.S. (*Id.* at 210-11). Like C.S., S.S. is Mr. Barron-Salazar's biological daughter. (*Id.* at 238).

Mr. Barron-Salazar was tried only for his sexual abuse of C.S., but the jury also heard about the acts of abuse he committed on S.S. Mr. Barron-Salazar began to molest S.S. when she was seven or eight years old, and the last act of abuse took place when she was eleven. (*Id.* at 224, 237-38, 240-52). The abuse was similar to that inflicted on C.S.; the only difference was that Mr. Barron-Salazar never attempted vaginal intercourse with S.S. (*Id.* at 240-44). As with C.S., Mr. Barron-Salazar told S.S. to "pinky promise [she] wouldn't tell because he would get in trouble." (*Id.* at 245).

While the abuse took place, Mr. Barron-Salazar worked as an electrician. (*Id.* at 216-17). His "work schedule" was "weekdays 7 a.m. to 3 p.m.," although he "occasionally worked weekends." (*Id.* at 262). At one point, Mr. Barron-Salazar spent "six or eight months" on a job in Okeechobee, living on site "for a week or two at a time." (*Id.* at 277-78). And on three occasions, Mr. Barron-Salazar separated from the victim's mother and moved out of the house. (*Id.* at 371). Each separation lasted two or three months. (*Id.*) Although he did not live with his daughters during the separations, he "visited very often." (*Id.* at 277).

Mr. Barron-Salazar was ultimately arrested and charged with sexual battery on a child under twelve, sexual battery by a person in familial or custodial authority, and lewd

or lascivious molestation. (*Id.*, Ex. 1, at 291-95). The case went to trial. Mr. Barron-Salazar testified in his defense. He denied abusing his daughters; he also claimed that their mother fabricated the allegations because "she didn't want to live with [him]." (*Id.*, Ex. 1a, at 393-99).

The jury found Mr. Barron-Salazar guilty as charged. (*Id.*, Ex. 1, at 323-24). The trial court sentenced him to a total term of life in prison without the possibility of parole. (*Id.* at 326-35). The appellate court affirmed the convictions. (*Id.*, Ex. 5). Next, Mr. Barron-Salazar unsuccessfully moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 7, at 1-55, 431-40, 442-48; Doc. 14-2, Ex. 10). This federal habeas petition followed. (Doc. 1).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court affirmed Mr. Barron-Salazar's convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant

rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable

probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.     Ineffective Assistance of Counsel

Mr. Barron-Salazar alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Barron-Salazar must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Barron-Salazar must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702

F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.    Discussion

### A.    Ground One, Sub-Claim A—Motion to Suppress Post-*Miranda* Statements

Mr. Barron-Salazar argues that the trial court violated his rights to due process and an "impartial trial" by denying his motion to suppress all "statements made during his custodial interrogation." (Doc. 1 at 7-8). Law enforcement interviewed Mr. Barron-Salazar on the evening of his arrest. (Doc. 14-2, Ex. 1, at 141-273). At the beginning of the interview, a detective read Mr. Barron-Salazar his *Miranda*[1] rights in English. (*Id.* at 143-47). He initially said he did not "really" understand the "right to remain silent," but after the detective explained his *Miranda* rights, he stated that he understood them. (*Id.*) Mr. Barron-Salazar denied sexually abusing his daughters. (*E.g.*, *id.* at 177). After learning that he had failed a polygraph test, however, he made the following statement: "If my daughter

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

say I did it I—have to be when I'm frigging drunk." (*Id.* at 236). This statement was followed by repeated denials of any abuse. (*E.g.*, *id.* at 245).

Mr. Barron-Salazar moved to suppress his post-*Miranda* statements, arguing that (1) he did not knowingly waive his rights because the *Miranda* warnings were given in English, not Spanish, and (2) his statement about doing something to his daughter while "drunk" was inadmissible because it "was inherently connected to [his] failure to pass [a polygraph] test." (*Id.* at 137-39). The trial court excluded the "partial statement" about a potential drunken incident, explaining that it was "inextricably intertwined with a discussion of the test results, which the State agreed [was] not admissible." (*Id.* at 279). But the court declined to "suppress the entire interview." (*Id.* at 276). According to the court, Mr. Barron-Salazar "made a free choice to waive [his] rights, and it was not a product of any intimidation, coercion, or deception." (*Id.*) Moreover, despite the alleged "language barrier," the prosecution met its "burden" of showing that Mr. Barron-Salazar "voluntarily made his decision to speak with law enforcement post-*Miranda* fully knowing the nature of the rights he was abandoning and the consequences of that abandonment." (*Id.*)

At trial, the prosecution did not seek to admit any portion of the interview during its case in chief. During cross-examination of Mr. Barron-Salazar, however, the prosecution briefly questioned him about certain statements he made during the interview. (*Id.*, Ex. 1a, at 404-07). Specifically, he admitted telling law enforcement that he had given C.S. $200 to "buy an iPad" for her birthday. (*Id.* at 406). But he denied saying that he had "made [C.S.] promise she wouldn't tell [her mother] about the $200." (*Id.* at 407). On redirect examination, Mr. Barron-Salazar clarified that the $200 was not "in consideration of

anything inappropriate like a sexual act." (*Id.* at 411). The prosecution did not mention any of this testimony during closing argument.

Mr. Barron-Salazar now contends that the trial court erred in denying his motion to suppress all "statements made during [his] custodial interrogation." (Doc. 1 at 7-8). According to him, his *Miranda* waiver was involuntary because his rights "were read to him in a language he could not understand." (*Id.* at 7). He also argues that "his statements were made under conditions that coerced and misled him into uttering statements which were used to incriminate him." (*Id.*)

Even assuming the trial court erred in denying the motion to suppress, Mr. Barron-Salazar is not entitled to relief because any error was harmless. "The admission of evidence obtained in violation of *Miranda* is subject to harmless error analysis." *United States v. Lall*, 607 F.3d 1277, 1292 (11th Cir. 2010). "The same is true regarding an involuntary confession obtained in violation of due process." *Id.* To show prejudice, Mr. Barron-Salazar must establish that "the admission of the . . . interrogation at trial had substantial and injurious effect or influence in determining the jury's verdict." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012). In other words, "there must be more than a reasonable possibility that the error contributed to the conviction." *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010).

No such possibility exists here. The prosecution did not seek to admit the interview during its case in chief, and the jury never heard Mr. Barron-Salazar's admission that he may have done something to his daughter while "drunk." (Doc. 14-2, Ex. 1, at 236). The jury did learn that, during the interrogation, Mr. Barron-Salazar admitted he had given C.S.

9

$200 to "buy an iPad" for her birthday. (*Id.*, Ex. 1a, at 406). And the jury heard him deny telling law enforcement that he had "made [C.S.] promise she wouldn't tell [her mother] about the $200." (*Id.* at 407). But these statements were "unimportant in relation to everything else the jury considered." *United States v. Nicholson*, 24 F.4th 1341, 1354 (11th Cir. 2022). They did not show that Mr. Barron-Salazar sexually abused C.S. Indeed, he clarified on redirect examination that the $200 was not "in consideration of anything inappropriate like a sexual act." (Doc. 14-2, Ex. 1a, at 411). At most, the statements suggested that Mr. Barron-Salazar had once asked C.S. to conceal a birthday present from her mother. In the context of the other evidence at trial—C.S.'s descriptions of the abuse and S.S.'s testimony about similar acts of abuse Mr. Barron-Salazar committed on her— the statements about the birthday present would have "made little difference to the jury verdict." *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006). Accordingly, any potential *Miranda* error was harmless.

## B. Ground One, Sub-Claim B—Admission of Collateral-Act Evidence and Child Hearsay

Mr. Barron-Salazar contends that the trial court violated his rights to due process and an "impartial trial" by admitting collateral-act evidence and child hearsay. (Doc. 1 at 8). The collateral-act evidence came from S.S., the victim's sister, who testified about acts of sexual abuse Mr. Barron-Salazar committed on her. (Doc. 14-2, Ex. 1, at 132; Doc. 14-2, Ex. 1a, at 234-35). The child hearsay came from C.S., the victim. After she disclosed the abuse, C.S. underwent a forensic interview with the Manatee County Child Protection Team. (*Id.*, Ex. 1a, at 326-27). During the interview, she described the abuse Mr. Barron-

Salazar had inflicted on her. (*Id.* at 341-55). A videotape of the interview was admitted into evidence and played for the jury. (*Id.*)

As Respondent correctly contends, Mr. Barron-Salazar failed to exhaust his claim that the admission of this evidence violated his constitutional rights. (Doc. 13 at 15). Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). A petitioner must do more, however, than "scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). Moreover, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief" to find the "federal claim." *Baldwin*, 541 U.S. at 32.

Mr. Barron-Salazar failed to present his federal constitutional claim on direct appeal. In his appellate brief, he argued that the trial court "erred in improperly allowing [collateral-act] testimony and child hearsay." (Doc. 14-2, Ex. 2, at 32). But Mr. Barron-Salazar did not argue that the admission of this evidence violated the federal constitution. (*Id.* at 32-40). Instead, he couched his argument entirely in terms of state law. (*Id.*) Indeed, he cited only state-court opinions, focusing in particular on Florida caselaw concerning "the admission of collateral[-]crime evidence" and "child hearsay." (*Id.* at 32-36). Thus,

11

Mr. Barron-Salazar failed to "make the state court aware that the claim[] [he] asserted present[ed] federal constitutional issues." *Jimenez*, 481 F.3d at 1342.

Mr. Barron-Salazar cannot return to state court to present his unexhausted claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, this claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Because Mr. Barron-Salazar offers no basis to excuse the default, Ground One, Sub-Claim B is barred from federal habeas review.

## C.   Ground One, Sub-Claim C—Sufficiency of the Evidence

Mr. Barron-Salazar argues that his convictions violate due process because the prosecution "failed to prove beyond a reasonable doubt that [he] committed the offenses charged." (Doc. 1 at 9). As Respondent correctly explains, this claim is unexhausted because Mr. Barron-Salazar failed to raise a federal issue on direct appeal. (Doc. 13 at 22). In his appellate brief, he argued that "the evidence was insufficient to sustain [his] convictions." (Doc. 14-2, Ex. 2, at 42). But he did not cite the United States Constitution or any other source of federal law. Nor did he "label[] the claim 'federal.'" *Baldwin*, 541 U.S. at 32. Instead, Mr. Barron-Salazar relied entirely on Florida caselaw to support his argument that the evidence was insufficient to support his convictions. (Doc. 14-2, Ex. 2, at 40-43). Because Mr. Barron-Salazar "did not raise any federal claims or cite to any federal cases in state court when presenting his argument on the sufficiency of the

evidence," he "failed to fairly present his federal sufficiency-of-the-evidence claim to the Florida state courts and thus did not exhaust his state court remedies as to that claim." *Cascante v. Florida*, 816 F. App'x 429, 431 (11th Cir. 2020); *see also Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 459 (11th Cir. 2015) (holding that federal sufficiency-of-the-evidence claim was not exhausted because petitioner "asserted in his [state appellate] brief that his conviction rested on insufficient evidence, without clarifying whether he intended to bring a federal or a state sufficiency of the evidence claim").

Mr. Barron-Salazar cannot return to state court to present his unexhausted claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3). As a result, this claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. And because Mr. Barron-Salazar has not shown that an exception applies to overcome the default, the claim is barred from federal habeas review.

Even if Mr. Barron-Salazar had exhausted a federal constitutional challenge to the sufficiency of the evidence, he would not be entitled to relief. Under the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable

13

doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.*

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Mr. Barron-Salazar fails to show that the state court's rejection of his sufficiency challenge was "objectively unreasonable." *Id.* C.S. testified that on several occasions, Mr. Barron-Salazar digitally penetrated her vagina, performed oral sex on her, and forced her to perform oral sex on him. (Doc. 14-2, Ex. 1a, at 202-09). She also stated that on one occasion, he attempted to insert his penis into her vagina, but he "stopped" when she "told him that it hurt." (*Id.* at 215). The abuse began when she was seven years old and continued until she was twelve. (*Id.* at 202-03, 208-09). This testimony was collectively sufficient to prove that Mr. Barron-Salazar committed sexual battery on C.S. *See* Fla. Stat. § 794.011(1)(h) (defining "sexual battery" as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object"). C.S. also testified that Mr. Barron-Salazar repeatedly touched her breasts, buttocks, and vagina when she was under the age of twelve. (Doc. 14-2, Ex. 1a, at 202-09). Based on this testimony, a rational jury could find Mr. Barron-Salazar guilty of lewd or lascivious molestation. *See* Fla. Stat. § 800.04(5)(b) (defining lewd or lascivious

molestation as "intentionally touch[ing] in a lewd or lascivious manner the breasts, genitals, genital area, or buttocks, or the clothing covering them, of a person").

Mr. Barron-Salazar contends that his convictions violate due process because "there [was] no physical evidence supporting the allegations against" him. (Doc. 1 at 9). But "[t]he testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction." *Bussell v. State*, 66 So. 3d 1059, 1061 (Fla. 1st DCA 2011). And Florida law provides that "in a prosecution" for sexual battery or lewd or lascivious molestation, "[t]he testimony of the victim need not be corroborated." Fla. Stat. § 794.022(1). Thus, Mr. Barron-Salazar's convictions do not violate due process simply because the prosecution failed to present physical evidence of abuse. *See United States v. Torres*, 531 F. App'x 964, 969 (11th Cir. 2013) ("The law does not care what evidence the Government presents—circumstantial, direct, testimonial, physical, scientific, or anything else admissible—as long as the evidence is sufficient for a reasonable jury to convict the defendant.").

Mr. Barron-Salazar likewise complains that C.S.'s testimony was "contradictory and confused." (Doc. 1 at 9). He notes, for example, that C.S. initially claimed she was "five or six years old" during the first incident, but "later . . . changed her answer to seven years old." (*Id.*) It is well established, however, that "[c]redibility determinations are the exclusive province of the jury." *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997). "For testimony of a government witness to be incredible as a matter of law, it must be unbelievable on its face." *Id.* "It must be testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under

the laws of nature." *Id.* Mr. Barron-Salazar cannot show that C.S.'s testimony was "incredible as a matter of law" under this standard. *Id.* Therefore, the Court must "defer[] to the jury's judgment as to the weight and credibility of the evidence." *Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir. 1987).

### D.    Ground Two, Sub-Claim A—Failure to Investigate "Job Schedules"

Mr. Barron-Salazar faults trial counsel for failing to adequately investigate his "job schedules," which allegedly would have established "inconsistencies in key witnesses' testimony" and "cast doubt on the theory of prosecution." (Doc. 1 at 13). According to Mr. Barron-Salazar, his schedules "would have revealed that" from October 2005 to October 2012 he was "not with the family and children as provided by the [prosecution's] witnesses." (Doc. 14-2, Ex. 7, at 432). Specifically, he "worked more than 40 hours a week . . . 99 percent of the time, including weekends," and he once "worked in Okeechobee." (*Id.* at 432-33).

The postconviction court rejected this claim. It explained that, if Mr. Barron-Salazar "mean[t] to claim that there [was] evidence to show that he was not home on the specific dates of the abuse, as alleged by the State witnesses, this claim [was] without merit, because no specific dates were alleged." (*Id.* at 444). As the court noted, C.S. "testified at trial to recalling that the first incident happened when she was seven years old, and she described the circumstances surrounding that incident." (*Id.*) C.S. "also said she remembered that similar abuse occurred on multiple occasions after that, most of which happened before she turned twelve, and she described the sexual acts." (*Id.*) But her testimony "contained no specific dates, and no other State witness provided particularized dates." (*Id.*)

16

According to the court, however, Mr. Barron-Salazar may have intended "to say that there was evidence . . . to show that he was *never home alone with* C.S." from October 2005 to October 2012 "because he was always working and/or living apart from the family during this time." (*Id.*) Any such assertion was, in the court's view, "plainly refuted by the record." (*Id.*) The court recounted that the victim's mother "testified that she and [Mr. Barron-Salazar] lived together from 2005 until 2014." (*Id.*) Mr. Barron-Salazar "was in charge of watching the children during the time she was in night school[] in 2008," "during the time she worked night shifts or weekends . . . in 2012," and "whenever she ran out to do errands." (*Id.*) The victim's mother also testified that Mr. Barron-Salazar "generally worked Monday to Friday, 7 a.m. to 3 p.m., with occasional overtime and work on Saturdays; and there was an 8-month period of time between 2014 and 2015 when [he] worked one-to-two week stretches in Okeechobee, but he generally returned home on the weekends." (*Id.* at 445).

The court noted that Mr. Barron-Salazar's own testimony was largely consistent with this "accounting." (*Id.*) For example, he "acknowledged that he stayed with the girls after work, anytime that [their mother] went out, including when she went out to a bar." (*Id.*) And he admitted that his "stretches working for a week at a time in Okeechobee were only in 2014." (*Id.*) Likewise, Mr. Barron-Salazar's "employer" testified that his "regular work hours were 7 a.m. to 3 p.m.," that "he frequently worked additional hours when needed, including weekends and Sundays," and that "for at least six months to a year," he worked in Okeechobee "for weeks at a time." (*Id.*)

Based on this testimony, the court rejected as "incredible and refuted by the record" Mr. Barron-Salazar's "claim that [c]ounsel could have found employment records showing that [he] was always working and was not home with [C.S. or S.S.] at the times of the alleged abuse." (*Id.*) Thus, the court held that counsel could not be "deemed deficient for failing to find such evidence." (*Id.*)

The rejection of this claim was reasonable. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which is "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. Thus, to prevail on his ineffective-assistance claim, Mr. Barron-Salazar must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020).

Mr. Barron-Salazar cannot make this showing. First, as the postconviction court explained, the offense conduct took place over several years, and no witness provided "specific dates" when the abuse took place. (Doc. 14-2, Ex. 7, at 444). Thus, even if Mr. Barron-Salazar could establish that he was "not home" on certain dates, that evidence would not have cast doubt on C.S.'s testimony about the abuse. In these circumstances, "[some] competent counsel" could have decided to refrain from presenting evidence that showed Mr. Barron-Salazar's absence from the house on specific dates. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000); *see also Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) ("Which witnesses, if any, to call, and when to call them, is the

epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess.").

Second, the postconviction court reasonably found that the record "refuted" Mr. Barron-Salazar's contention that he could present evidence showing "he was never home alone with" C.S. from October 2005 to October 2012. (Doc. 14-2, Ex. 7, at 444 (emphasis omitted)). This factual determination is "entitled to a presumption of correctness unless [Mr. Barron-Salazar] rebuts that presumption by clear and convincing evidence." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022). He has not done so. As the postconviction court explained, the trial record—including Mr. Barron-Salazar's own testimony—established that he was often home alone with C.S. or S.S. during the relevant timeframe. (Doc. 14-2, Ex. 7, at 444-45). Mr. Barron-Salazar has never presented any evidence to the contrary. Thus, the postconviction court reasonably rejected as "incredible" the assertion that counsel "could have found employment records showing that [Mr. Barron-Salazar] was always working and was [never] home" when the abuse took place. (*Id.* at 445). "Counsel cannot manufacture evidence, and the Constitution does not require the presentation of evidence that does not exist." *Schwab v. Crosby*, 451 F.3d 1308, 1321 (11th Cir. 2006).

### E.   Ground Two, Sub-Claim B—Failure to Object to Prosecutorial Misconduct

Mr. Barron-Salazar faults trial counsel for failing to object to several instances of alleged prosecutorial misconduct. (Doc. 1 at 13). According to Mr. Barron-Salazar, the prosecution "referred to the [] victim's sister [S.S.] as a victim [even though] [Mr. Barron-

Salazar] was not charged and tried on any violations against" S.S. (Doc. 14-2, Ex. 7, at 7).
Mr. Barron-Salazar also alleges that during closing argument, the prosecution improperly
"inflame[d] the minds and passions of the jurors," "attacked [his] character," and vouched
for the testimony of the State's witnesses. (*Id.* at 9-12).

The postconviction court reasonably rejected this claim. As the court acknowledged,
the prosecution "did make references to the 'victims' and to 'the first victim,' when
referring to C.S. and her sister, S.S." (*Id.* at 40). The court noted, however, that the
comments cited by Mr. Barron-Salazar "were made outside of the presence of the jury, so
that [he could not] demonstrate prejudice." (*Id.*) This ruling was both factually and legally
correct. (*Id.*, Ex. 1a, at 195-98 (relevant portion of trial transcript); *see also Fulwise v.
Hetzel*, No. 5:13-cv-1767-KOB-HGD, 2015 WL 5063744, at *5 (N.D. Ala. Mar. 19, 2015)
(finding no "prejudice" from reference to petitioner's "involvement in a prior murder"
because "this occurrence was outside the presence of the jury"), *adopted by* 2015 WL
3916680 (N.D. Ala. June 25, 2015)). Even if the prosecution had referred to S.S. as a victim
in front of the jury, there is no "reasonable probability" that such a reference would have
affected the verdict. *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir.
2014); *see also United States v. Lussier*, No. 18-cr-281-NEB-LIB, 2019 WL 2489906, at
*5 (D. Minn. June 15, 2019) ("The term 'victim' is not inherently prejudicial. It is a term
commonly used in the English language that does not by its nature connote guilt.").

Likewise, the postconviction court reasonably concluded that counsel was not
deficient for failing to object to the prosecution's closing remarks. "To find prosecutorial
misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the

remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

First, as the postconviction court explained, the prosecution did not improperly "inflame the jurors' emotions." (Doc. 14-2, Ex. 7, at 43). In closing, the prosecution urged the jury to "use . . . reason and common sense" in considering C.S.'s testimony: "Think about the pain she was experiencing in having to relive what her father did to her all through her childhood and taking away her innocence, and sexually abusing her all her life and how painful that was and how real it was to her." (*Id.*, Ex. 1a, at 420). The prosecution argued that the "difficult[y]" C.S. experienced in recounting the abuse rebutted Mr. Barron-Salazar's suggestion that her mother had fabricated the allegations. (*Id.* at 422-23).

These remarks were not improper. "A prosecutor's remarks, suggestions, insinuations, and assertions are improper when they are calculated to mislead or inflame the jury's passions." *United States v. Azmat*, 805 F.3d 1018, 1044 (11th Cir. 2015). But "an attorney is allowed to argue . . . credibility of witnesses . . . so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006). Here, the prosecution argued that C.S. was credible based on "the pain she . . . experienc[ed] in" recounting Mr. Barron-Salazar's abuse. (Doc. 14-2, Ex. 1a, at 420). This argument was in direct response to Mr. Barron-Salazar's assertion that the mother had fabricated the abuse. (*Id.* at 396). The prosecution "was entitled to include remarks in closing that were based

on evidence and reasonable inferences therefrom (including the victim's demeanor on the

stand) to rebut the defense's theory about credibility." *McClusky v. State*, 311 So. 3d 1016,

1019 (Fla. 1st DCA 2021); *see also Hernandez v. Sec'y, Dep't of Corr.*, No. 22-13866,

2024 WL 1554359, at *5 (11th Cir. Apr. 10, 2024) (state court reasonably found nothing

"improper" or "legally objectionable" in prosecutorial remarks discussing "the difficulty

the [] victim went through in testifying at trial and the courage it took to disclose what had

happened to her").

Second, the prosecution did not improperly attack Mr. Barron-Salazar's character.

In closing, the prosecution argued that Mr. Barron-Salazar lacked credibility for the

following reasons: "[T]he defendant is the one who has an interest in how the case should

be decided. The defendant is the only one whose testimony and evidence did not agree with

all the other testimony and other evidence in the case. The defendant is the one who was

not honest and straightforward in answering the questions. You saw the way he was trying

to avoid every question I asked him. He was coming up with his own things that were

totally unrelated to what I was asking him." (Doc. 14-2, Ex. 1a, at 421).

This was a fair comment on Mr. Barron-Salazar's credibility. As the postconviction

court explained, his testimony on cross-examination "could fairly be characterized as

evasive." (*Id.*, Ex. 7, at 45). For example, he only reluctantly acknowledged that he "got

back together mutually" with the victim's mother "each time" they "broke up." (*Id.*, Ex.

1a, at 399-400). As noted above, the prosecution is permitted to "comment[] on a witness's

credibility." *United States v. Sosa*, 777 F.3d 1279, 1295 (11th Cir. 2015). Moreover, as the

postconviction court noted, Mr. Barron-Salazar "denied the abuse, which could be

portrayed as untruthful." (Doc. 14-2, Ex. 7, at 45). "[A] prosecutor is justified in arguing during closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial." *United States v. Schmitz*, 634 F.3d 1247, 1270 (11th Cir. 2011).

Third, the prosecution did not improperly vouch for the testimony of C.S. or S.S. "A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "To determine if the government improperly vouched for a witness, the court must decide whether a jury could reasonably believe that the prosecutor was indicating a personal belief in the witness'[s] credibility." *Id.* "This prohibition against vouching does not, however, forbid prosecutors from arguing credibility; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *Id.*

Mr. Barron-Salazar contends that the following remarks constituted improper vouching: "So just think about all of this, that all of these details that would have had to have been made up and remembered throughout this whole case and consistently testified to throughout the whole case, all of these details. They are not lies. It's the truth, because it's all just as anyone would expect, using your reason and common sense, that something like this would go down." (Doc. 14-2, Ex. 1a, at 424).

These remarks did not "amount to an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). Instead, as the postconviction court noted, the "the comments were made as part of

23

the State's broader argument that the witnesses who testified to the sequence of events leading up to [C.S.'s] disclosure, including [her mother] and [S.S.], would have been hard pressed to get all the details of their individual testimonies to coincide with the testimony of each other witness—so that it was logical to conclude that they were all telling the truth." (Doc. 14-2, Ex. 7, at 45). As explained above, "an attorney is allowed to argue . . . credibility of witnesses . . . so long as the argument is based on the evidence." *Miller*, 926 So. 2d at 1254-55.

For all these reasons, Mr. Barron-Salazar's proposed objections lack merit. Thus, the postconviction court reasonably concluded that counsel was not deficient for failing to raise them. *See Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

## F.    Ground Two, Sub-Claim C—Failure to Challenge Collateral-Act Evidence

Mr. Barron-Salazar contends that trial counsel provided ineffective assistance by failing to "object" to the prosecution's request to introduce collateral-act evidence. (Doc. 1 at 14). As noted above, the collateral-act evidence came from S.S., the victim's sister, who testified about acts of sexual abuse Mr. Barron-Salazar committed on her. (Doc. 14-2, Ex. 1, at 132; Doc. 14-2, Ex. 1a, at 234-35). According to Mr. Barron-Salazar, counsel allowed the prosecution to admit collateral-act evidence "without first [asking the trial court to] determin[e] whether [he] had committed the collateral acts [against S.S.] by clear and convincing evidence." (Doc. 1 at 13-14).

The postconviction court correctly rejected this claim. Before trial, the prosecution filed a "notice of intent to use" collateral-act evidence concerning Mr. Barron-Salazar's abuse of S.S. (Doc. 14-2, Ex. 1, at 78). Defense counsel subsequently moved to exclude the collateral-act evidence, arguing (among other things) that the proposed testimony was "not similar to the alleged crime in age, time[,] or manner in which the acts were allegedly committed." (*Id.* at 103). After reviewing S.S.'s deposition testimony and the transcript of her forensic interview, the trial court ruled that "the collateral crimes evidence presented by the State [was] not substantially outweighed by the danger of unfair prejudice to" Mr. Barron-Salazar. (*Id.* at 131). The court reserved decision, however, on whether the evidence satisfied the "clear and convincing standard." (*Id.* at 129). Under Florida law, collateral-act evidence cannot be introduced until "the trial court . . . find[s] that the State has presented clear and convincing evidence that the defendant committed the collateral acts." *Donton v. State*, 1 So. 3d 1092, 1095 (Fla. 1st DCA 2009). The court explained that it would allow the prosecution "an opportunity at trial—outside the presen[ce] of the jury—to meet its evidentiary burden with respect to the collateral acts referenced in its notice and motion." (Doc. 14-2, Ex. 1, at 129-30).

The proffer of S.S.'s testimony took place on the second day of trial, before she testified in front of the jury. (*Id.*, Ex. 1a, at 222-29). After the proffer, defense counsel opposed admission of the testimony, arguing that (1) "there [was] nothing sufficiently unique about" the molestation alleged by S.S., and (2) "the way that [S.S.] testified here outside . . . the presence of the jury" showed that her testimony would be "more prejudicial than probative." (*Id.* at 234). The court found that the evidence satisfied the "clear and

convincing" standard and "permit[ted] the State to present th[e] testimony." (*Id.* at 234-35).

Thus, as the postconviction court held, the record refutes Mr. Barron-Salazar's assertion that counsel "failed to litigate" the admissibility of the collateral-act evidence. (*Id.*, Ex. 7, at 42). To the contrary, counsel vigorously opposed admission of this evidence both before and during trial. Mr. Barron-Salazar "cannot demonstrate deficient performance when counsel did what [he] wanted him to do." *Owens v. Sec'y, Dep't of Corr.*, No. 5:14-cv-266-RH-GRJ, 2017 WL 9440396, at *8 (N.D. Fla. Apr. 18, 2017), *adopted by* 2017 WL 2861651 (N.D. Fla. July 5, 2017).

### G.    Ground Two, Sub-Claim D—Failure to Call or Adequately Question Witnesses

Mr. Barron-Salazar faults trial counsel for failing to call his brother Oscar Salazar as a witness at trial. (Doc. 1 at 14). He also contends that counsel failed to adequately question his other brother, Santiago Salazar, when he testified at trial. (*Id.*) According to Mr. Barron-Salazar, Oscar[2] would have provided "[d]ates when the daughters came to visit" Mr. Barron-Salazar during his separations from their mother. (Doc. 14-2, Ex. 7, at 437). This testimony allegedly would have been significant because, in Mr. Barron-Salazar's view, "it's hard to imagine a child who has been abused . . . in such dirty and ugly ways . . . wanting to come and see" their abuser. (*Id.*)

---

[2] To avoid confusion, the Court refers to Oscar Salazar and Santiago Salazar by their first names. No disrespect is intended.

As for Santiago, counsel allegedly failed to properly question him at trial about "dates and times when [Mr. Barron-Salazar] was not at home." (*Id.* at 435). Santiago testified that on three occasions, Mr. Barron-Salazar had separated from the victim's mother and lived "near" him for two or three months. (*Id.*, Ex. 1a, at 370-71). According to Mr. Barron-Salazar, counsel should have elicited from Santiago more precise dates, including the "year" and "month[]" of the separations. (*Id.*, Ex. 7, at 436). Such testimony allegedly would have cast doubt on Mr. Barron-Salazar's guilt. (*Id.*)

The postconviction court found that this claim was "without merit." (*Id.* at 446). It held that the proposed "testimony from Oscar" would "not have a created a reasonable probability of a different jury verdict." (*Id.* at 447). According to the court, evidence that C.S. and S.S. "visited with [Mr. Barron-Salazar] during times of separation from the family . . . would not have been impactful." (*Id.*) As the court pointed out, Mr. Barron-Salazar testified at trial that C.S. and S.S. were "very sad" when he "had to leave the house," and that they were "happ[y]" when he returned. (*Id.*, Ex. 1a, at 395). Furthermore, the jury heard expert testimony that a "child may love the[ir] abuser." (*Id.* at 328). Thus, the postconviction court found "no resulting prejudice" from the failure to "call Oscar as a witness." (*Id.*, Ex. 7, at 447).

The court likewise found no prejudice from the failure to "more deeply probe[] Santiago on the stand." (*Id.* at 446-47). As the court noted, "Santiago testified that he could not recall how long [Mr. Barron-Salazar] and [the victim's mother] were together as a couple, or the year that [they] were married." (*Id.* at 447). Thus, the court found implausible the suggestion that Santiago "nonetheless[] knew the month, year, and duration of each

27

occasion when [Mr. Barron-Salazar] left his family residence and moved near to Santiago." (*Id.*) But even if Santiago "could recall these dates," he "testified at trial that there were only three such occasions, and that each time [Mr. Barron-Salazar] lived nearby to him for two or three months." (*Id.*) According to the court, "[p]roviding the precise dates of these time periods would not have negated testimony from C.S., S.S., and [their mother] that [Mr. Barron-Salazar] lived with the family at times between [October 2005] and [October 2014], and that he sexually abused the girls on occasions when he was there, when the opportunity arose." (*Id.*)

The postconviction court acted reasonably in finding no prejudice. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Barron-Salazar]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Barron-Salazar cannot meet this demanding standard. Oscar allegedly would have provided "[d]ates when the daughters came to visit" Mr. Barron-Salazar during his separations from their mother. (Doc. 14-2, Ex. 7, at 437). According to Mr. Barron-Salazar,

this testimony would have supported his defense because "it's hard to imagine a child who has been [sexually] abused . . . wanting to come and see" their abuser. (*Id.*) But, as the postconviction court explained, the jury heard Mr. Barron-Salazar's testimony that C.S. and S.S. were "very sad" when he "had to leave the house," and that they were "happ[y]" when he returned. (*Id.*, Ex. 1a, at 395). Thus, Oscar's testimony would have been cumulative—that is, it would have merely "amplifie[d] [a] theme[] presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014). "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). In any event, the prosecution's expert testified that a "child may love the[ir] abuser." (Doc. 14-2, Ex. 1a, at 328). The jury could have relied on that testimony to reject Mr. Barron-Salazar's suggestion that "a child who has been [sexually] abused" would not "want[] to come and see" their abuser. (*Id.*, Ex. 7, at 437).

Mr. Barron-Salazar says counsel should have elicited from Santiago the "year" and "month[]" of his separations from the victim's mother. (*Id.* at 436). As the postconviction court correctly explained, such testimony would have had little impact on the jury's assessment of the evidence. (*Id.* at 447). Mr. Barron-Salazar separated from the victim's mother three times, with each separation lasting two or three months. (*Id.*, Ex. 1a, at 370-71). The abuse took place over many years, and Mr. Barron-Salazar himself admitted that he would be home alone with his daughters when their mother was out. (*Id.* at 403-04). Thus, as the postconviction court explained, the "precise dates" of the separations "would not have negated testimony from C.S., S.S., and [their mother] that [Mr. Barron-Salazar]

lived with the family at times between [October 2005] and [October 2014], and that he sexually abused the girls on occasions when he was there, when the opportunity arose." (*Id.*, Ex. 7, at 447). The postconviction court thus reasonably found no prejudice from the failure to "more deeply probe[] Santiago on the stand." (*Id.* at 446-47).

## H.    Ground Two, Sub-Claim E—Failure to Obtain Medical Records

Mr. Barron-Salazar faults trial counsel for failing to obtain C.S. and S.S.'s medical records, which allegedly would have shown that "he did not commit any of the . . . crimes." (Doc. 1 at 13; Doc. 14-2, Ex. 7, at 15). He points out that, on cross-examination, the victim's mother testified that she took "[C.S. and S.S.] for doctor exams" after the abuse was disclosed. (Doc. 14-2, Ex. 1a, at 281). According to Mr. Barron-Salazar, counsel should have obtained records from these examinations, which allegedly would have shown no physical evidence of sexual abuse. (*Id.*, Ex. 7, at 14-16).

The postconviction court rejected this claim. It found that, even assuming the existence of "medical reports showing an absence of physical evidence consistent with sexual abuse," Mr. Barron-Salazar could not "demonstrate resulting prejudice" from the failure to present them at trial. (*Id.* at 49). The court explained that the testimony of both C.S. and S.S. "revealed types of sexual abuse that, by general knowledge, would not have likely resulted in physical findings, particularly as the incidents took place over a number of years and not very close in time to the disclosures."[3] (*Id.*) Moreover, the prosecution

---

[3] The abuse was disclosed in January 2015. (Doc. 14-2, Ex. 1, at 1). The last incident involving C.S. had taken place over a year earlier. (*Id.*, Ex. 1a, at 200, 208-09). The last incident involving S.S. had taken place approximately three months before the disclosure. (*Id.* at 247-48).

"also offered no physical evidence of the abuse." (*Id.*) Thus, the court explained, "the impact of reports showing an *absence* of physical evidence would have been very minimal." (*Id.*)

The court also pointed out that, during closing argument, defense counsel "made good use of the State's failure to present positive physical evidence that [C.S. or S.S.] had been abused and argued to the jury that this militated in favor of finding reasonable doubt." (*Id.*) Counsel argued as follows:

> [The victim's mother] also said that, yes, in fact, she did take the girls to the doctor. Lack of evidence. A reasonable inference from the facts is, if she took them to the doctor and they found there was something wrong, you can bet [the prosecutor] would have introduced it. She's introduced everything else that was harmful to Mr. [Barron-Salazar]; why wouldn't she introduce that if it was harmful? The answer is it wasn't. There's no physical evidence to back up these claims. And again, when we're talking about charges as serious as we're talking about, it's important that you have corroboration other than words, and there just isn't any. That's a lack of evidence. That's a reasonable doubt.

(*Id.*, Ex. 1a, at 437-38). Citing this portion of the closing argument, the postconviction court found that "the jury was free to deduce that there was no physical evidence from the State's failure to present any." (*Id.*, Ex. 7, at 50). Thus, the court ruled that Mr. Barron-Salazar could not "show a likelihood that the jury would have reached a different verdict had evidence of negative results been presented." (*Id.*)

The rejection of this claim was reasonable. Mr. Barron-Salazar cannot show that the court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin*, 89 F.4th at 1317. As the postconviction court explained, C.S. and S.S. described "types of sexual abuse that, by general knowledge,

31

would not have likely resulted in physical findings, particularly as the incidents took place over a number of years and not very close in time to the disclosures." (Doc. 14-2, Ex. 7, at 49). Indeed, many courts have recognized that "the lack of physical evidence is common [in sexual abuse cases] and that it is neither exculpatory nor inculpatory of sexual abuse." *Ochoa v. Cockrell*, 37 F. App'x 90, 90 (5th Cir. 2002); *see also Harris v. Haynes*, No. 20-cv-6167-JCC-SKV, 2021 WL 5854848, at *2 (W.D. Wash. Sept. 20, 2021) (recounting expert testimony that "[m]ost of the time when kids have been sexually abused, their bodies are fine" and that "research supports that when kids have been sexually abused, it's normal for them to not have any physical signs on examination"), *adopted by* 2021 WL 5847216 (W.D. Wash. Dec. 9, 2021).

Moreover, as the postconviction court noted, defense counsel urged the jury to infer the absence of "physical evidence" from the prosecution's failure to present any at trial. (Doc. 14-2, Ex. 1a, at 437-38). In these circumstances, a reasonable jurist could conclude that the presentation of medical records showing no physical signs of abuse would "have had an isolated, trivial effect" on the "entire evidentiary picture." *Strickland*, 466 U.S. at 695-96. Thus, the postconviction court correctly found no "reasonable probability that, but for counsel's [failure to present the medical records], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

## I.  Ground Two, Sub-Claim F—Failure to Move for Judgment of Acquittal

Lastly, Mr. Barron-Salazar argues that trial counsel provided ineffective assistance by failing to move for a judgment of acquittal "on the sufficiency of the evidence presented at trial." (Doc. 1 at 15). After the prosecution rested, counsel informed the trial court that

he lacked "a good faith basis for judgment of acquittal" because the evidence was "sufficient to go to a jury." (Doc. 14-2, Ex. 1a, at 356). According to Mr. Barron-Salazar, counsel "was ineffective for not challenging [the] sufficiency of the evidence" because "the State didn't prove every crime beyond a reasonable doubt." (*Id.*, Ex. 7, at 26).

The postconviction court rejected this claim, finding that "the record le[ft] little doubt that there was sufficient evidence of each element of the offenses charged to send the case to the jury, so that any motion for [a judgment of acquittal] made by [c]ounsel would have been denied." (*Id.* at 51). The postconviction court was correct. As explained above in connection with Ground One, Sub-Claim C, the prosecution presented sufficient evidence to prove beyond a reasonable doubt that Mr. Barron-Salazar committed sexual battery and lewd or lascivious molestation. Thus, counsel was not deficient for failing to raise a meritless sufficiency challenge. *See Freeman*, 536 F.3d at 1233 (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

## IV.    Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Barron-Salazar's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Barron-Salazar and to **CLOSE** this case.

3. Mr. Barron-Salazar is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of

a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Barron-Salazar must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Barron-Salazar has not made the requisite showing. Because Mr. Barron-Salazar is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on January 30, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE